IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM LINABURG,

        Plaintiff,

v.                                                               Civil Action No. 1:13-CV-177

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

**A. Background**

On July 31, 2013, William Linaburg filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) for judicial for review of the decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f.[1] The Commissioner filed her Answer on October 18, 2013.[2] Mr. Linaburg then filed his Motion for Summary Judgment on November 1, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on November 27, 2013.[4] The motions are now ripe for this Court's review, and for this report and recommendation.

**B. The Pleadings**

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 8.

[4] Docket No. 10.

1. Mr. Linaburg's Motion for Summary Judgment and Memorandum in Support.

2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

**C. Recommendation**

I recommend that:

1. Mr. Linaburg's Motion for Summary Judgment be **GRANTED** because the Administrative Law Judge ("ALJ") did not properly evaluate whether Listing 12.05 is met; and, therefore, his decision was not based on substantial evidence.

2. Commissioner's Motion for Summary Judgment be **DENIED** for the reasons set forth.

3. The case be **REMANDED** so that the ALJ may appropriately address Listing 12.05.

## II. FACTS

**A. Procedural History**

On November 30, 2010, Mr. Linaburg protectively applied for DIB and SSI alleging an onset of disability of December 31, 2008 due to neck pain and mental retardation. (R. 106-19, 136.) The applications were initially denied on March 4, 2011, and upon reconsideration on May 18, 2011. (R. 37-40.) Mr. Linaburg requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 11, 2012. (R. 22-36.) Mr. Linaburg, who was represented by counsel, appeared by video and testified at the hearing, as did an impartial vocational expert. (*Id*.) On June 28, 2012, the ALJ issued an unfavorable decision finding that Mr. Linaburg was not disabled because, although he has several severe impairments, he is capable of performing his past relevant work as a mental health aide. (R. 14-21.) On August 10, 2012, Mr. Linaburg requested review of this decision by the Appeals Council. (R. 8-10.) On July 24, 2013, the Appeals Council denied review. (R. 1-5.) Mr.

Linaburg then timely brought his claim to this Court.

**B. Personal History**

Mr. Linaburg was born on December 1, 1968, making him 43 years old on the date of the ALJ's decision. (R. 136.) He has been married for about three years, but has been with his wife for over sixteen years. He has a fifteen year old son, a twenty-one year old step-son, and a one year old grandson. He was in special education throughout school, and he was classified as learning disabled. (R. 251.) Academic records show a history of failing and repeating classes, although he did graduate number 437 out of 551 students. Mr. Linaburg has held numerous jobs, including as a meat cutter, a truck washer, a dock loader, and has an aide to disabled children. He has been unemployed since the onset of his alleged disability, with the exception of one failed work attempt at a mulch plant.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Mr. Linaburg is not under a disability and can still perform work in the national economy.[5]

On January 19, 2011, state consultive psychologist Tracy Cosner-Shepherd, M.S., performed several mental assessments of Mr. Linaburg, including a clinical interview, a mental status examination, a Wechsler Adult Intelligence Scale (WAIS-III), and a Wide Range Achievement Test (WRAT-3). (R. 256-61.) Mr. Linaburg drove himself to the appointment, was dressed casually but somewhat unkempt, and exhibited a cooperative attitude. (R. 256.) He reported that he has had learning problems since childhood, and that lately he has had difficulty sleeping, crying spells, and low energy. He also reported that he gets upset easily and has some problems with memory and

---

[5]Because the sole issue is whether Mr. Linaburg's mental impairments meet Listing 12.05, the only relevant medical evidence concerns mental disability.

concentration. He denied any history of mental health or substance abuse treatment.

Mr. Linaburg reported that he had learning problems and received special education services throughout school. He reported that he repeated the first grade. He denied being involved in school activities, but also denied that he was a discipline problem. He also stated that he attempted to take a carpenter class, but he did not finish it. He reported that he was currently in a welding class, but was having difficulty. He reported difficulties with reading, writing, and comprehension. As for his vocational history, Mr. Linaburg reported that he had been fired a couple of times and that he sometimes had difficulties with his supervisors. He denied having any supervisory experience. He reported that he did have to do some paperwork, but that he would have to ask for help.

During the mental status examination, Mr. Linaburg displayed a cooperative attitude and a pleasant mood. He maintained good eye contact and gave appropriate responses. His thought process was within normal limits. His insight was fair and his judgment was markedly deficient. His immediate and remote memory were within normal limits but his recent memory was markedly deficient. His concentration was moderately deficient, and his psychomotor behavior was normal. In the intellectual assessment, WAIS-III, Mr. Linaburg achieved a verbal IQ score of 67, a performance IQ score of 69, and full scale IQ of 65. (R. 259.) Dr. Cosner-Shepherd found that:

> The claimant appeared to put forth good effort on the test items with some need for repetition of directions. He did generally cooperate and comply with all requests. He appeared to have a good attitude about the testing process. He did not complain of any visual difficulties. He stated that he did graduate from high school. He repeated the 1st grade. He said his grades were fairly good. He received some vocational training and is currently receiving vocational training. He reported problems with reading and writing and problems with comprehension. Results are generally felt to be a valid reflection of his intellectual functioning.

(*Id.*) On the WRAT-3, Mr. Linaburg scored a 64 in reading, a 55 in spelling, and a 50 on arithmetic.

These scores place him at a fourth grade level in reading, a second grade level in spelling, and a third grade level in arithmetic. Dr. Cosner-Shepherd stated that the results of the WRAT-3 "appear to be valid" and "are rather commensurate with intellectual functioning." (R. 260.) Dr. Cosner-Shepherd diagnosed Mr. Linaburg with mild mental retardation and possible adjustment disorder. Additionally, she noted that "the diagnosis of Mild Mental Retardation was based on current test results, which appears to be consistent with academic history and adaptive functioning."

On January 31, 2011, Jim Capage, Ph.D., performed a psychiatric review of Mr. Linaburg and determined that he had the medically determinable impairment of mild mental retardation under Listing 12.05. Dr. Capage found that Mr. Linaburg had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22," and that he had a valid verbal, performance, or full scale IQ of 60 through 70 under the "D" criteria of Listing 12.05. Under the "D" criteria of Listing 12.05,[6] Dr. Capage found that Mr. Linaburg had mild restrictions of activities of daily living; mild difficulties in maintaining social function; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Capage did not consider whether Mr. Linaburg met the "C" criteria of Listing 12.05, and, instead, found that he did not meet listing 12.05D.

On February 28, 2011, Dr. Capage prepared a mental RFC assessment. He found that Mr. Linaburg had moderate limitations on the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. Under the section entitled "Adaption," Dr. Capage found that Mr. Linaburg had moderate limitations on the ability to respond appropriately to changes

---

[6]The "D" criteria of Listing 12.05 is the same as what is normally called the "B" criteria of the Section 12 Listings.

in the work setting. In the narrative portion of the form, Dr. Capage stated:

> Clmt's alleges learning problems and this is consistent with school system reports that indicate poor academics and placement in a learning disabled program. His work history and Activities of Daily Living are consistent with this allegation of learning disability. CE source indicates valid IQ scores in the 60s with commensurate functioning and diagnosed Mild MR. This finding seems contrary to the school system reports that he was in the learning disabled program as well as the claimant's work history and ADL's which suggest functioning higher than Mild MR. While it may be argued that the clmt's functioning is higher, *the more conservative approach is taken and per the CE, the claimant is here evaluated under 12.05D*. The clmt's impairment is severe, but does not meet nor equal this Listing. MRFC indicates that he can at least perform simple unskilled 1-2 step work related activities in a setting involving few changes in routine.

(R. 285.)

**D. Testimonial Evidence**

At the hearing held on June 11, 2012, Mr. Linaburg testified that he graduated from high school, but that he was in special education the whole time. He stated that he was able to read, but that he struggles with reading and writing. When asked if he had any difficulty getting his driver's license, he stated that it took him a few tries to pass the written test. He testified that he has had problems concentrating since he was in school and that he sometimes has problems with his memory.

### III. ALJ FINDINGS

In determining whether Mr. Linaburg was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920. At step one, the ALJ found that Mr. Linaburg had not engaged in substantial gainful activity since December 31, 2008, the alleged onset date of disability. At step two, the ALJ found that Mr. Linaburg had the following severe

impairments: spondylosis of the cervical and lumbar spine, cervicalgia, obesity, mild mental retardation, and adjustment disorder. At the third step, the ALJ found that none of Mr. Linaburg's impairments meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In order to consider step four of the process, the ALJ determined that Mr. Linaburg has the residual functional capacity (RFC) to perform the full range of light, unskilled work. In step four, the ALJ compared Mr. Linaburg's RFC with the physical and mental demands of his past relevant work as a mental health aide and found that he was capable of performing that work as it is actually and generally performed. Accordingly, the ALJ found that Mr. Linaburg was not disabled.

## IV. THE MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

Mr. Linaburg contends that the ALJ erred at step three of the sequential process by finding that his intellectual impairments did not meet or medically equal Listing 12.05. The Commissioner, on the other hand, contends that the ALJ's decision that Mr. Linaburg did not meet Listing 12.05 is based upon substantial evidence.

### B. The Standards

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed

in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

2. *Judicial Review*

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

3. *Social Security - Medically Determinable Impairment - Burden.*

Mr. Linaburg bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

**C. Discussion**

The only issue before the Court is whether the ALJ erred by concluding that Mr. Linaburg's cognitive impairments did not meet or equal Listing 12.05, the listing for intellectual disability.[7] The determination of whether a claimant meets Listing 12.05 is a two-step process. 20 C.F.R. § 404 app. 1, 12.00(A); *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). First, the claimant must satisfy the diagnostic description of intellectual disability set forth in the introductory paragraph of Listing 12.05, which requires a showing of "significantly subaverage general intellectual functioning[8] with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404 app. 1, 12.05. Second, the claimant must establish the required level of severity by satisfying one of the four categories labeled (A)-(D) under section 12.05. *Id*. As relevant here, 12.05C requires a showing of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. Thus, to meet Listing 12.05C, Mr. Linaburg has to satisfy three prongs: (1) that he has deficits in adaptive functioning that manifested before age twenty-two; (2) that he has a valid verbal, performance, or full scale IQ of 60 through 70; and (3) that he has a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Hancock,* 667 F.3d at 473.

As an initial matter, there is no question Mr. Linaburg has satisfied the last two prongs of Listing 12.05C. The ALJ found that Mr. Linaburg "achieved a full scale IQ of 65, placing him in

---

[7]After the ALJ's decision, the SSA replaced the term "mental retardation" with "intellectual disability," effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service." *Id.* at 46,500.

[8]Significantly subaverage intellectual functioning generally means IQ scores of around 70 or below. 67 Fed.Reg. 20018–01, at 20022; *Durden v. Astrue*, 586 F.Supp.2d 828, 833.

the mild range of mental retardation," and the Commissioner concedes the validity of Mr. Linaburg's reported IQ scores. Additionally, although not specifically addressed in the ALJ's written decision, Mr. Linaburg also satisfies the "work-related limitation of function" prong of 12.05C because the ALJ found at step two that he suffers from multiple severe impairments, in additional to mild mental retardation. *See* 20 C.F.R. Pt 404, Subpt. P, App. 1 § 12.00A ("For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c)."); *Luckey v. Dept. of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989) (holding that a claimant satisfied the second prong of 12.05C if the claimant has an additional severe impairment or cannot perform his past relevant work); *Jackson v. Astrue*, 467 F. App'x 214, 217 (4th Cir.2012) (finding that where ALJ found severe impairments at step two, along with other diagnosed conditions, claimant had satisfied the "impairment imposing an additional and significant work-related limitation of function" prong). Therefore, the only issue is whether substantial evidence supports the ALJ's finding that Mr. Linaburg failed to satisfy the diagnostic description of mental retardation in the introductory paragraph of 12.05.

In concluding that Mr. Linaburg's mental impairments did not meet the severity of Listing 12.05, the ALJ explained as follows:

> Section 12.05 dealing with mental retardation requires significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period before age 22. In view of the fact that these results were obtained several years after attaining age 22, and since his adaptive functioning was not significantly limited as demonstrated by his ability to graduate high school and make average to above average

10

> grades in the 12th grade, live independently with his wife and child, engage in substantial gainful work activity for several years and some of his jobs required him to complete reports, write, and use technical skills, and pass a written driver's test, the undersigned concludes that the provisions of section 12.05 are not applicable. Rather, section 12.02 dealing with organic mental disorders will be used to evaluate his cognitive disorder.

Mr. Linaburg argues that this conclusion is contrary to the uncontradicted opinions of Dr. Cosner-Shepherd and Dr. Capage, both of whom found adaptive functioning deficits, as well as to uncontroverted record evidence clearing showing deficiencies in adaptive functioning manifesting before age twenty-two. The Commissioner appears to concede that the evidence shows deficits in academic functioning manifesting before age 22, but contends that pursuant to the DSM's definition of mental retardation "academics is only one of three adaptive functioning domains for which Plaintiff must show a deficit," and that Mr. Linaburg "has made no showing that he has social and practical (self-management across life settings) deficits." The Commissioner also asserts that the ALJ's conclusion is supported by Dr. Capage's opinion that Mr. Linaburg did not meet Listing 12.05. After carefully considering the record, the undersigned finds that the ALJ's decision is not supported by substantial evidence.

First, the undersigned rejects the Commissioner's assertion that the DSM's standards are necessarily controlling on the issue of whether a claimant has deficits in adaptive functioning. The SSA has expressly declined to mandate standards for determining "deficits in adaptive functioning," recognizing that "the method of measuring the required deficits in adaptive functioning differ" among the four major organizations in the United States dealing with mental retardation, and noting that the "SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Technical*

*Revisions to Medical Criteria for Determinations of Disability*, 67 Fed.Reg. 20018–01, at 20022 (April 24, 2002). Equally unavailing is the Commissioner's contention that evidence of academic deficits alone is necessarily insufficient to satisfy the diagnostic description. *See Jackson v. Astrue*, 2012 WL 580239, at *3 (4th Cir. Feb. 23, 2012) (internal citation omitted) ("[D]eficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."); *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar.7, 2011) (rejecting the Commissioner's argument that the plaintiff failed to meet the diagnostic description of mental retardation by showing only limitations in academic functioning and holding that evidence of a deficiency in functional academic skills alone can satisfy the diagnostic description of mental retardation). The regulations do not "specify what degree of deficit is required (mild versus [moderate], for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue*, 690 F.Supp.2d 464, 477.

Here, the record is replete with evidence that Mr. Linaburg has deficits in the area of functional academic skills and that those deficits manifested before age 22. He was enrolled in the special education program in school, and, although he graduated 437th out of 551 students, his records reveal that he struggled academically, often failing, and having to repeat, courses. Additionally, Mr. Linaburg reported that he failed first grade and struggles with reading and writing. Testing revealed that he reads at a fourth grade level. He also reported that he had to retake his driving test multiple times before he passed it, and that he is struggling to keep up in the welding class he is taking. The ALJ relied, in part, on Mr. Linaburg's "ability to graduate from high school

and make average to above average grades in the 12th grade" in finding that Mr. Linaburg's adaptive functioning was not deficient. However, the ALJ completely omitted from his written decision any mention of evidence showing that Mr. Linaburg was in special education classes, failed first-grade, and had very poor academic performance, with the exception of his last year. Similarly, the ALJ found it significant that Mr. Linaburg was taking welding classes and passed his drivers test; however, he did not discuss evidence showing that Mr. Linaburg was struggling to keep up in the welding classes and repeated his drivers test multiple time before he finally passed it. While the ALJ was not required to credit this evidence, his failure to even mention it makes review of his decision impossible. *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir.1987) (remand is appropriate where an ALJ fails to discuss relevant evidence that weighs against his decision).

Moreover, contrary to the Commissioner's contention, the record does contain evidence of deficits in areas other than academic functioning. For example, Dr. Cosner-Shepherd found that Mr. Linaburg had marked deficiencies in recent memory, moderate deficiencies in concentration, mild deficiencies in pace, and marked deficiencies in judgment. Dr. Capage opined that Mr. Linaburg had moderate limitations in the ability to understand, remember, and carry out detailed instructions and in the ability to respond appropriately to changes in the work setting. Mr. Linaburg reported to Dr. Cosner-Shepher that if a job involved any paperwork he would have to get help, that he had difficulties with supervisors, and that he had been fired on more than one occasion. Further, elsewhere in his decision, the ALJ specifically found that Mr. Linaburg had mild limitations in activities of daily living and social functioning, and moderate limitations with regard to

concentration, persistence, and pace. The ALJ also acknowledged that Mr. Linaburg struggles with reading and writing and exhibits deficits in recent memory, concentration, and judgment.[9]

However, despite these limitations, the ALJ appeared to reason that Mr. Linaburg did not suffer from deficits in adaptive functioning because he was able to live independently, perform chores, pay bills, work, and maintain a family. Likewise, the Commissioner argues that because "Plaintiff is not someone who has never held a job, who never moved out of his parents' house, who is dependent on others to make decisions for him, or who relies on others for transportation, or to handle his finances," he cannot be found to suffer "from deficits in adaptive functioning such that he would meet the agency's intellectual disability listing." While evidence of an individual's ability to live independently and hold a job may certainly support a conclusion that the individual is functioning at a higher level than his IQ scores suggests, thereby precluding a finding of mental retardation, *see, e.g., Hancock*, 667 F.3d at 474–76, the fact that a claimant is able to work, raise a family, and otherwise live successfully in the community does not necessarily preclude a finding of mild mental retardation where other deficits in adaptive functioning are present. As explained by the Sixth Circuit in *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991):

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder—about

---

[9]As noted above, the regulations do not "specify what degree of deficit is required (mild versus [moderate], for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue*, 690 F.Supp.2d 464, 477. However, because a claimant must also show deficits in adaptive functioning to qualify under all four severity levels (A-D) of Listing 12.05, the deficits necessary to satisfy the diagnostic description would appear to be less than the severity criteria of Listing 12.05D, which requires a claimant to show at least marked restrictions in activities of daily living, social functioning, or maintaining concentration, persistence, or pace. *See Nelson v. Astrue*, 2012 WL 373364 (M.D.N.C. Feb. 3, 2012) ("Any other interpretation might reduce Prong 3 of Listing 12.05D to a nullity, something courts generally must avoid."). A finding of at least moderate limitations of functioning has been held to be facially in tension with the ALJ's conclusion that a claimant lacks deficits in adaptive functioning. *See Nelson v. Astrue*, 2012 WL 373364 (M.D.N.C. Feb. 3, 2012); *Hager v. Astrue*, 2011 WL 1299509 (S.D.W. Va. Mar. 31, 2011).

> 85%. People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*See also Durden*, 586 F.Supp.2d at 839 ("While [gardening, driving and performing household chores] would tend to support a finding that [claimant] does not have deficits in certain areas of adaptive functioning, they do not necessarily negate a finding of such deficits in other areas."). In fact, Listing 12.05C assumes the ability to work at unskilled jobs. *Shaw v. Astrue*, 2009 WL 2486932, at *6–7 (E.D.N.C. Aug. 13, 2009) (unpublished) ("However, the fact that a claimant has been able to work in the past does not necessarily suggest that the claimant does not satisfy the deficits in adaptive functioning requirement.... 'Listing 12.05(C) assume[s] many, if not most, mildly mentally retarded individuals will be able to work ... [but that they may] subsequently become disabled due to the development of additional severe impairments.'") (quoting *Muntzert v. Astrue*, 502 F.Supp.2d 1148, 1158 (D.Kan.2007)).

The Court does recognize that the ALJ may have simply chosen to credit other evidence in the record with regard to Mr. Linaburg's level of adaptive functioning. *See, e.g., Weaver v. Astrue*, 2010 WL 1947216 (M.D.N.C. May 13, 2010) (holding that ALJ was entitled to give more weight to a medical expert's opinion in concluding that the claimant was of borderline intelligence than the opinions of two consulting psychologists who had indicated that the claimant was mildly mentally retarded). However, here, the only other evidence in the record concerning Mr. Linaburg's cognitive

impairments directly contradicts the ALJ's conclusion that Mr. Linaburg does not have deficits in adaptive functioning. Dr. Cosner-Shepard specifically diagnosed Mr. Linaburg with "mild mental retardation" carrying the DSM diagnosis code of 317, which is defined as "significantly subaverage general intellectual functioning ... that is accompanied by *significant limitations in adaptive functioning* in at least two ... skill areas ..." DSM IV at 39 (emphasis added). Thus, the diagnosis itself carries with it a finding that Mr. Linaburg has significant limitations in adaptive functioning. Additionally, Dr. Cosner-Shepard conducted a thorough interview of Mr. Linaburg and was fully aware of his abilities and limitations, and concluded that "the diagnosis of mild mental retardation...appears to be consistent with academic history and adaptive functioning." The ALJ was free to reject this evidence, but, as noted below, he adopted its findings instead.

Moreover, contrary to the Commissioner's contention, Dr. Capage agreed with Dr. Cosner-Shepard's diagnosis of mild mental retardation and concluded that Mr. Linaburg met the diagnostic description of mental retardation, including deficits in adaptive functioning. While the Commissioner correctly points out that Dr. Capage noted that Mr. Linaburg's work history and activities of daily living "suggest functioning higher than Mild MR," Dr. Capage concluded that "while it may be argued that the clmt's functioning is higher, the more conservative approach is taken and per the CE, the clmt is here evaluated under 12.05D."[10] Dr. Capage ultimately found that Mr. Linaburg did not meet Listing 12.05, *not because he lacked deficits in adaptive functioning*, but because he evaluated Mr. Linaburg under 12.05D, and found that Mr. Linaburg had only mild

---

[10]Listing 12.05D is met by satisfying the diagnostic description of mental retardation and "[a] valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." Had Dr. Capage checked box 12.05C instead of box 12.05D, Mr. Linaburg would have been found disabled at step 3.

restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Thus, the Commissioner's argument that the ALJ properly relied on Dr. Capage's opinion in finding that Mr. Linaburg had no deficits in adaptive functioning lacks merit because Dr. Capage's opinion directly contradicts the ALJ's conclusion. Additionally, the ALJ did not even mention Dr. Capage's opinion in his written decision, much less explain the weight he gave it or the reasons for that weight.

Most significantly, however, is the fact that the ALJ apparently adopted Dr. Cosner-Shepard's diagnosis and Dr. Capage's opinion, and found that Mr. Linaburg's severe impairments include "mild mental retardation," a finding which directly contradicts his finding of no deficits in adaptive functioning. *See Durden v. Astrue*, 586 F.Supp.2d 828, 834 (S.D.Tx. 2008) (characterizing the ALJ's finding that the plaintiff failed to show deficits in adaptive functioning as "clearly inconsistent" with the ALJ's finding that the plaintiff had mild mental retardation); *Durham v. Apfel*, 34 F.Supp.2d 1373, 1381 (N.D.Ga.1998) (noting the contradiction between the ALJ's finding that the plaintiff did not satisfy the diagnostic definition of Listing 12.05 and his acceptance of the mild mental retardation diagnosis by two psychologists). The ALJ was certainly free to reject the medical evidence as to Mr. Linaburg's low IQ score and level of adaptive functioning, as inconsistent with other evidence of Mr. Linaburg's adaptive functioning. Instead, the ALJ seemingly adopted the findings of the medical experts throughout his written decision, and then inexplicably reached a contradictory conclusion. Thus, rather than weigh the evidence and resolve conflicts as to Mr. Linaburg's level of adaptive functioning, the ALJ's decision actually creates the conflict.

### IV. RECOMMENDATION

In sum, the ALJ ignored relevant evidence regarding the issue of whether Mr. Linaburg suffered from deficits in adaptive functioning making it impossible for this Court to determine whether the decision is based on substantial evidence. Additionally, the ALJ appears to have simultaneously adopted and rejected the only medical evidence in the record on this issue, making the ALJ's decision internally inconsistent and impossible to review. Accordingly, the undersigned **RECOMMENDS THAT** this case be remanded for the ALJ to determine whether Mr. Linaburg's condition meets Listing 12.05C and to explain how the evidence on the record as a whole supports the decision.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: June 11, 2014

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE